UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| DUANE BIG EAGLE, | * | CIV 13-3015-RAL |
| | * | |
| Petitioner, | * | |
| | * | OPINION AND ORDER |
| vs. | * | DENYING MOTION |
| | * | UNDER 28 U.S.C. § 2255 |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent. | * | |

On August 4, 2011, a jury found Petitioner Duane Dale Big Eagle ("Big Eagle") guilty of two counts of conspiracy to commit bribery of an Indian tribal official and one count of aiding and abetting a bribery involving an agent of an Indian tribal government. United States v. Big Eagle, CR 10-30088-RAL, Doc. 88.[1] The jury acquitted Big Eagle on one count of bribery involving an agent of an Indian tribal government. CR Doc. 88. This Court sentenced Big Eagle to 36 months on each of the three counts of conviction, to be served concurrently. CR Doc. 106. Big Eagle appealed to the United States Court of Appeals for the Eighth Circuit, which affirmed Big Eagle's conviction. United States v. Big Eagle, 702 F.3d 1125, 1126 (8th Cir. 2013).

Big Eagle now has filed a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 in this case. CIV Doc. 1. Big Eagle in his motion raised five grounds, all of which contended that his trial counsel provided ineffective assistance to him. CIV Doc. 1 at 5-6. Big Eagle filed a Memorandum of Law supporting the § 2255 motion. CIV Doc. 2. This Court screened the case and ordered the Government to file a response. CIV Doc. 7. The Government resisted the motion, CIV Doc. 17, and filed an affidavit signed by Big Eagle's trial counsel

---

[1] Citations to pleadings from Big Eagle's criminal case will be "CR Doc." followed by the document number from the Case Management/Electronic Case Filing (CM/ECF) System. Citations to pleadings from the present civil case, CIV 13-3015-RAL, in which this Opinion and Order is being entered will be "CIV Doc." followed by the CM/ECF document number.

disputing Big Eagle's contentions. CIV Doc. 17-2. Big Eagle filed a reply thereafter. CIV Doc. 20. For the reasons explained herein, this Court denies Big Eagle's § 2255 motion.

## I. Facts

### A. Facts from underlying criminal case.

Big Eagle was chairman of the tribal council of the Crow Creek Sioux Tribe from May of 1992 through May of 1998, and then from May of 2002 through May of 2006. Tr. 45-46.[2] Big Eagle was reelected chairman in May of 2010, and was serving as tribal chairman at the time of his trial. Tr. 46. The Crow Creek Sioux Tribe is a federally recognized Indian tribe that receives federal funds consistent with the federal government's trust relationship with Native American Indians and Indian tribes.

Certain officials of the Crow Creek Sioux Tribe had accepted bribes and received kickbacks both during times when Big Eagle was tribal chairman and when Big Eagle was not tribal chairman. At Big Eagle's trial, no fewer than five of the witnesses who testified had pleaded guilty and been convicted of federal felony offenses regarding bribes and kickbacks. See Tr. 78, 89-90, 216-17, 260; see also United States v. McClatchey, 09-CR-30036-KES, Docs. 3, 15. The central question at Big Eagle's trial was whether the Government proved beyond a reasonable doubt that Big Eagle himself engaged in certain incidences of bribery and kickbacks and thus was guilty of the crimes charged.

Big Eagle was indicted on two counts of conspiracy to commit bribery of a tribal official and two counts of bribery involving an agent of an Indian tribal government. CR Doc. 3. Counts I and II of the Indictment charged Big Eagle with criminal conduct concerning the Crow Creek Tribe's schools, Royal Kutz d/b/a Kutz Construction, and Scott Raue. CR Doc. 3. Counts III and

---

[2] The facts section is taken largely from trial testimony. See CR Doc. 116. Citations to the trial transcript in Big Eagle's criminal trial will be "Tr." followed by the page number. The transcript is available in the CM/ECF system at CR Doc. 116.

2

IV charged Big Eagle with engaging in criminal conduct regarding an October 21, 2008 meeting during which Big Eagle received payment from a contractor named Archie Baumann, part of which Big Eagle then distributed to tribal officials. CR Doc. 3. The parties understood there to be in essence two parts to the case—Counts I and II alleging that Big Eagle received bribes and was complicit in a bribery scheme while tribal council chairman regarding construction work done at the Crow Creek Tribe's school, and Counts III and IV alleging that Big Eagle facilitated and was complicit in a bribe paid by Archie Baumann to others at a time when Big Eagle was not tribal chairman or on tribal council. CR Doc. 3.

Big Eagle privately retained criminal defense attorney Dana Hanna. CR Doc. 18. Hanna is a member of the Criminal Justice Act panel in the District of South Dakota and an experienced trial lawyer in criminal cases in federal district court in South Dakota. Hanna filed a series of pretrial motions, including a motion for a bill of particulars, CR Doc. 26; a motion for release of Brady material, CR Doc. 38; a motion seeking to dismiss part of the indictment, CR Doc. 51; motions for ex parte subpoenas, CR Docs. 56, 57, 58, 59, 62, 63, 82; and motions in limine, CR Doc. 67. Hanna filed on behalf of Big Eagle an exhibit list and witness list. CR Docs. 78, 84.

At trial, testimony concerning the bribery scheme related to the Crow Creek Sioux Tribe's school came from those the Government alleged to be Big Eagle's co-conspirators, including Scott Raue and Norman Thompson, Sr.[3] In short, a fire in April of 2005 caused extensive damage to a dormitory at the Crow Creek Sioux Tribe school. Tr. 91-92. Around that time, the school had approximately 600 children enrolled, with 256 of those children living at the school

---

[3] Because two witnesses with the last name of Thompson testified, this Opinion and Order uses the full name of Norman Thompson, Sr., to avoid any confusion between him and witness Lester Thompson. Norman Thompson, Sr. solicited and received bribes while on tribal council. By contrast, Lester Thompson had no involvement in the bribery scheme, became suspicious upon joining tribal council that moneys had disappeared, was without question an honest man and witness, and helped bring the bribery scheme to light.

3

in dormitory settings. Tr. 92. The Tribe ultimately received over $4 million from its insurer and the federal government to rebuild the dormitory and repair other buildings. Tr. 93. In addition, the school typically received in excess of $8 million dollars annually from the federal government for its operations. Tr. 94.

In 2005, and during the aftermath of the fire when school buildings were being repaired, Big Eagle was the chairman of the tribal council. Tr. 91. The chairman of the tribal council of the Crow Creek Sioux Tribe presides at meetings, but votes only in case of a tie vote. Tr. 367. Also on the tribal council at the time were Norman Thompson, Sr., Randy Shields, and Loren "Rocky" Fallis, among others. Tr. 91. The Crow Creek Sioux Tribe had no separate school board; rather, the tribal council members constituted the school board. Tr. 91.

Scott Raue was superintendent of schools for the Crow Creek Sioux Tribe at the time of the fire and rebuilding project. Tr. 90-91. Because of the immediate need to rebuild the dormitory and perform other repairs at the school, there was no bid letting for the work. Tr. 94-95. According to Raue, the tribal council gave him authority to hire contractors and certain members of the tribal council—Big Eagle, Norman Thompson, Sr., and Shields—told him how much money they wanted kicked back to them from the contractors. Tr. 95-96, 156-57.

The Tribe retained Craig McClatchey, who had worked with the Tribe previously, as the architect on the rebuilding project. Tr. 100, 232-33. McClatchey's only client at the time was the Crow Creek Sioux Tribe. Tr. 237. McClatchey testified that he over billed for his services and kicked back payments totaling between $80,000 and $120,000 from his fees to Raue. Tr. 238. At one point in the relationship, McClatchey expressed uncertainty about continuing such an arrangement. Tr. 238-41. During a lunch McClatchey was having with his daughter and Raue in June or July of 2005, McClatchey met the tribal chairman, whom McClatchey identified at trial as Big Eagle. Tr. 240-42. Big Eagle upon meeting McClatchey stood behind McClatchey's

4

daughter, looked at McClatchey, and said, "You are going to play ball with us, aren't you, Craig?" Tr. 242.

One of the contractors hired to do work on the Crow Creek Sioux Tribe and at the Crow Creek Sioux Tribe's School in 2005 was Royal "Shorty" Kutz, who did business as Kutz Construction. Tr. 63-64. Kutz dealt with Raue, billing the Tribe what Raue told him to bill. Tr. 77-78. Kutz commonly would deposit checks received from the Tribe at his bank and withdraw cash of $10,000, Trial Exs. 3, 7, 14, 17, or, in one case, $8,000, Ex. 10. Kutz then would hand cash to Raue or leave cash in a specified location for Raue to retrieve. Tr. 67, 77.

Raue testified that he paid cash to Big Eagle on ten to fifteen occasions out of the kickbacks he was receiving on the construction work at the school. Tr. 118. Raue acknowledged that he himself kept and spent a lot of money and that the amount he personally retained from the bribery and kickback scheme exceeded his $60,000 a year salary. Tr. 144. Norman Thompson, Sr., a member of the tribal council and in turn the school board at the time, testified that he received moneys from Raue that were being kicked back from the school rebuilding project. Tr. 268-69. Norman Thompson, Sr. recounted a meeting in or around October of 2005 at Big Eagle's place of business—a bait shop at Fort Thompson, South Dakota. Tr. 269-70. At that meeting, Big Eagle, Norman Thompson, Sr., and fellow council member Shields and Raue were present. Tr. 269-70. Raue put money on the pool table, which Big Eagle divided up in a way where $2,000 each went to Shields, Norman Thompson, Sr., and Raue, with Big Eagle retaining $4,000, a larger share because he was tribal council chairman. Tr. 269-70.

In May of 2006, Lester Thompson—not to be confused with Norman Thompson, Sr.—became tribal chairman thereby succeeding Big Eagle. Tr. 367-68. Lester Thompson became concerned about where all the money had gone and about the very poor financial state of the Tribe. Tr. 367-370. After reviewing tribal financial records regarding the school, Lester

Thompson called law enforcement because of the evident misuse of funds. Tr. 370. The Office of Inspector General of the United States Department of the Interior thereafter became involved. Tr. 370. The bribery scheme began to unravel, with Raue, Kutz, and McClatchey, among others being indicted in federal court.

In the face of this evidence, Hanna ably cross-examined the witnesses, eliciting from Kutz that he had no direct dealings with Big Eagle. Tr. 81-82. Hanna assailed Raue as being a gambling addict and a crook, who was testifying in an effort to have his sentence reduced. Tr. 130-31, 141. Hanna established that McClatchey had only once met the tribal chairman, tried to get McClatchey to concede that the meeting was too long ago to remember clearly, and asked questions to cast doubt on whether it was Big Eagle at the lunch. Tr. 248-50, 257-59. Hanna in cross-examination ripped into Norman Thompson, Sr. for his past contradictory statements. Tr. 300-06. Hanna's cross-examination of Norman Thompson, Sr. was so scathing at one point that Norman Thompson, Sr. invoked his Fifth Amendment privilege not to incriminate himself. Tr. 306.

Counts III and IV of the Indictment alleged that Big Eagle on October 21, 2008, engaged in conspiracy to commit bribery of a tribal official and bribery involving an agent of an Indian tribal government. CR Doc. 3. These counts related to a meeting on October 21, 2008, at the office of contractor Archie Baumann. Baumann and Big Eagle had known each other for years. Baumann and his businesses First Dakota Enterprises, Inc., and Drifting Goose Construction—a business Baumann set up for his then-girlfriend who was Native American thus making the business a Native American owned business—had done business on the Crow Creek Indian Reservation during the time when Big Eagle was tribal chairman. See Tr. 108, 168. For instance, during Big Eagle's tenure as tribal chairman, the Crow Creek Sioux Tribe had obtained a loan from Baumann for $200,000, on February 8, 2006. Trial Ex. 18. Big Eagle as tribal

chairman signed the loan agreement with Baumann. Trial Ex. 18. Approximately fourteen weeks later, on May 26, 2006, Baumann received from the tribe $232,656 to pay off the loan, netting $32,656, which figures to be an annual interest rate of in excess of 600 percent. Trial Ex. 20.

After Big Eagle left as tribal chairman and Lester Thompson became tribal chairman, Baumann lost his working relationship with the Tribe. Tr. 371, 375. Upon the election of Brandon Sazue as the new tribal chairman in May of 2008, however, Baumann sought to renew his relationship with the Tribe. Sazue through other tribal council members received an unsolicited payment from Baumann. Tr. 373-74. On June 18, 2008, Baumann extended a $160,000.00 loan to the tribe, Trial Ex. 22, which was repaid on July 17, 2008, through a payment of $209,271.36. Trial Ex. 26. In this way, Baumann netted $49,271.36 on a $160,000.00 loan outstanding for approximately one month, which figures to be an annual interest rate in excess of 3,600 percent. Baumann was not keeping the profit himself on these loans. At the time, Baumann was making payments directly to tribal council members Randy Shields, Trial Ex. 23, Norman Thompson, Sr., Trial Ex. 24, and as mentioned above to the new tribal chairman Brandon Sazue, Trial Exs. 25, 28. Sazue was uncomfortable with receiving money from Baumann and reported the matter to law enforcement. Tr. 375.

On August 8, 2008, Baumann wired $50,000 to the Crow Creek Sioux Tribe, which he intended to be a loan. Ex. 29. Baumann had not received a signed promissory note and was concerned about the lack of documentation regarding the loan and the Tribe's responsibility to repay the loan. Tr. 175. Baumann entered into a contract with the Tribe dated August 26, 2008, to build three homes near the school in exchange for $383,740. Tr. 176-77.

Big Eagle was neither the tribal chairman nor on the tribal council during 2008. Tr. 46-49. Nevertheless, Big Eagle together with fellow former tribal council member Rocky Fallis

7

attended a meeting between Baumann and tribal council members Shields and Norman Thompson, Sr. Tr. 49. By October of 2008, Scott Raue was under federal indictment for the bribery scheme concerning the Tribe's school building project, had lost his job with the Tribe, but had been hired by Baumann and was at the meeting. Tr. 107-09, 112, 121, 275. Then tribal chairman Brandon Sazue arrived last of all to the meeting, wearing a recording device as part of his cooperation with the Government, unbeknownst to all the others who were at the meeting. Tr. 274. As a result, conversation that occurred while Sazue was present was recorded and played to the jury at trial. Tr. 397.

Prior to Sazue's arrival, according to trial testimony, Big Eagle discussed with Norman Thompson, Sr. and Shields both how to get money out of Baumann and Raue's upcoming federal court trial on bribery charges. Tr. 111, 274-76. Once Sazue arrived, Baumann is recorded expressing unease in paying further moneys because Raue, Kutz, and another contractor all had been indicted regarding the kickbacks and bribes from the school project. The recording includes discussion of how Baumann could avoid directly paying tribal council members by writing a check to Big Eagle, who was not on the tribal council at the time and who in turn would distribute money to the existing tribal council members in on the meeting—Norman Thompson, Sr., Shields, and Sazue. After significant discussion, Big Eagle directed that his name be put on the check. Trial Ex. 35 at 48. Big Eagle and others were recorded as follows:

> BIG EAGLE: Yeah, yeah. Anyway, so, if you guys want me to do anything I'll do it.
> BAUMANN: Alright.
> NORMAN THOMPSON, SR.: Well, want to write you a check in your name you know.
> BIG EAGLE: That's fine. No problem. I'm probably a stretched old man anyway.
> BAUMANN: So you uh, when, when, when do you want to go to jail?
> BIG EAGLE: Anytime before December 2nd.

Trial Ex. 35 at 56. The reference to December 2nd was to the scheduled date of Raue's federal criminal trial, at which Big Eagle anticipated possibly testifying.

As the conversation progressed, Baumann confirmed that Big Eagle wanted the check written to him. Trial Ex. 35 at 57. Baumann then commented "you boys are too expensive." Trial Ex. 35 at 59. Big Eagle asked Baumann to tell his bank to stay open until after Big Eagle got there with the check. Trial Ex. 35 at 58. Baumann called his bank to make sure that sufficient money was in his account to cover the check. Trial Ex. 35 at 58-59. Big Eagle then received from Baumann a check for $5,000, left to cash it, and returned. Big Eagle distributed $1,000 to Sazue, $1,000 to Norman Thompson, Sr., $1,000 to Shields, and $1,000 to Rocky Fallis. Big Eagle kept the remaining $1,000 for himself. Trial Ex. 35 at 71-72. At trial, Baumann explained that his goal during the meeting was to get the Tribe to sign a loan agreement to document the $50,000 loan he had made in August and that he wanted to retain the contract to build homes at the Tribe's school. Tr. 184-85.

Big Eagle's trial counsel faced difficulty in defending on Counts III and IV because of the recording of the meeting on October 21, 2008, and the undeniable fact that Big Eagle received a $5,000 check from Baumann that he cashed and then distributed $1,000 each to three existing members of the tribal council. Trial attorney Hanna elicited that Sazue had recorded many other meetings, where Big Eagle did not attend and was not discussed, that Sazue was surprised to see Big Eagle at the October 21 meeting, and that Big Eagle himself was not on tribal council but needed money to support grandchildren who had recently come into his care. Hanna characterized the payment to Big Eagle not as a bribe but rather a loan or a payment from a friend.

The jury returned a verdict of guilty on Counts I, III, and IV, but not guilty on Count II. CR Doc. 88. This Court sentenced Big Eagle to thirty-six months in prison on each count of

conviction, to be served concurrently. CR Doc. 106. Hanna represented Big Eagle at sentencing and on appeal to the United States Court of Appeals for the Eighth Circuit, which affirmed Big Eagle's conviction. Big Eagle, 702 F.3d at 1126.

### B. Facts regarding Big Eagle's contentions.

Big Eagle's § 2255 motion contains five grounds all of which allege ineffective assistance of counsel. However, Big Eagle in his memorandum of law, CIV Doc. 2, makes factual accusations beyond the scope of the five grounds for relief. Many of these factual allegations are completely mistaken. For instance, Big Eagle contends that Hanna did not make a closing argument. CIV Doc. 2 at 4. Hanna in fact made an extensive closing argument. Big Eagle also contends that he was allowed to make a statement to the jury following closing argument, which, as Big Eagle puts it, "is unheard of!" CIV Doc. 2 at 4, 8. As Big Eagle later acknowledged in his reply, he had confused his allocution at his later sentencing hearing with what had occurred at trial. CIV Doc. 21 at 6. Rather than bothering further with such stray and mistaken factual contentions, this Court focuses on the matters claimed by Big Eagle to constitute ineffective assistance of counsel.

Big Eagle claims in Ground One of his motion that his trial counsel denied him a right to testify. CIV Docs. 1-2. Hanna, however, in his affidavit makes clear what communication occurred on the subject. CIV Doc. 17-2. Hanna and Big Eagle discussed whether Big Eagle should testify on more than one occasion. CIV Doc. 17-2. Hanna consistently advised that Big Eagle had an absolute right to testify in his own defense and that the decision whether to testify was Big Eagle's alone to make. Hanna told Big Eagle that the final decision as to whether to testify would not be made until the Government rested its case. CIV Doc. 17-2. Hanna ultimately advised Big Eagle against testifying, but restated to Big Eagle that he had the right to

testify and that he alone would make the final decision. CIV Doc. 17-2. Big Eagle chose not to testify.

Grounds Two and Five of Big Eagle's motion allege ineffective assistance in connection with Hanna's handling of the testimony of architect Craig McClatchey. CIV Docs. 1-2. Big Eagle believes that Hanna conceded at trial that the lunch meeting about which McClatchey testified occurred, CIV Doc. 2 at 11, and allowed McClatchey to describe his perception that Big Eagle was threatening McClatchey's daughter, CIV Doc. 2 at 18. In fact, Hanna filed a pretrial motion in limine to prohibit testimony from McClatchey about perceiving the statement from Big Eagle to be a threat to McClatchey's daughter. CR Doc. 67 at 4-5. This Court, although making clear that its ruling on such a motion was preliminary only, granted Hanna's motion. Tr. at 32-33. At trial, consistent with this Court's ruling, McClatchey was permitted to testify about being at a lunch with his daughter, being introduced to the tribal chairman (whom he recognized at trial as Big Eagle), and hearing Big Eagle say as he looked into McClatchey's eyes, "You are going to play ball with us, aren't you, Craig?" Tr. at 240-42. In cross-examination of McClatchey, Hanna did not concede that the meeting took place, but rather asked questions designed to suggest that McClatchey, who had never previously met Big Eagle, might be mistaken and could not have remembered with such clarity a lunch that had occurred some five or six years earlier than his testimony. See Tr. 245-59. McClatchey, to explain why he remembered the statement so clearly, ultimately testified that he remembered Big Eagle having his hands on the back of the chair of McClatchey's daughter and looking straight at McClatchey as he made the statement. Tr. at 249. McClatchey did not testify that he perceived the statement to be a threat on his daughter's life. Hanna nevertheless raised as an issue on appeal legal issues surrounding McClatchey's testimony in this regard, and the Eighth Circuit affirmed Big Eagle's convictions. Big Eagle, 702 F.3d at 1131-32.

In Ground Three of his motion Big Eagle contends that Hanna provided ineffective assistance of counsel by failing to obtain a jury instruction regarding Big Eagle not testifying. Doc. 1 at 6. In reality, this Court in Instruction 9 of the Final Instructions to the Jury included the following:

> There is no burden upon a defendant to prove that he is innocent. Accordingly, the fact that defendant did not testify must not be considered by you in any way, or even discussed, in arriving at your verdict.

CR Doc. 87 at 9.

In Ground Four of the § 2255 motion, Big Eagle contends that Hanna provided ineffective assistance of counsel by failing to adequately investigate. CIV Doc. 2 at 15. In his Memorandum, Big Eagle also claims that Hanna told Big Eagle that he had only tried one federal criminal case to a jury and asked to withdraw two weeks before the trial. CIV Doc. 2 at 1. The facts do not support Big Eagle's claim.

Hanna is a lawyer familiar to this Court based on his appointments to defend complicated and difficult criminal cases. Hanna in his affidavit details his experience and makes clear that no conversation akin to what Big Eagle claims occurred. CIV Doc. 17-2. Hanna began defending federal criminal defendants in Omaha, Nebraska, in and around 1981. CIV Doc. 17-2. He moved his practice to New York City, where he practiced criminal law in state and federal courts there from 1983 until 1997. CIV Doc. 17-2. Hanna was a member of the Criminal Justice Act panels in the United States District Court for the Eastern District of New York and in the United States District Court for the Southern District of New York. CIV Doc. 17-2. There, he tried jury cases involving bank robbery, drug conspiracies, and complex multi-defendant racketeering conspiracies. CIV Doc. 17-2. In one case, Hanna was involved in a four-month trial involving a conspiracy to violate the Racketeer Influenced and Corrupt Organization Act (RICO) that resulted in an acquittal of his client on all charges, and on another occasion a two-

month RICO conspiracy trial that resulted in acquittal of his client on all racketeering charges. CIV Doc. 17-2. After becoming a member of the South Dakota Bar in 1998 and moving to South Dakota, Hanna continued his criminal trial work in state and federal court. CIV Doc. 17-2. He had tried three federal jury trials in the United States District Court for the District of South Dakota prior to Big Eagle's case, two of which resulted in acquittals. CIV Doc. 17-2. Hanna estimated that by the time he tried Big Eagle's case, he had tried close to 100 criminal jury trials. CIV Doc. 17-2. Hanna disputes ever telling Big Eagle that he had only tried one previous federal case, which in fact would have been not true, or that he wanted to withdraw as Big Eagle's counsel two weeks before trial. CIV Doc. 17-2.

To prepare for Big Eagle's case, Hanna hired two private investigators to assist him in the investigation. CIV Doc. 17-2. Between those two private investigators and Hanna, more than two dozen witnesses or potential witnesses were interviewed. CIV Doc. 17-2. Hanna himself personally interviewed certain key witnesses in the case, including Royal "Shorty" Kutz, Craig McClatchey, and Loren "Rocky" Fallis. CIV Doc. 17-2. Hanna sought to interview certain Government witnesses who declined to be interviewed, including Brandon Sazue and Scott Raue. CIV Doc. 17-2. At trial, Hanna demonstrated a firm grasp of the facts and thorough preparation for the trial.

## II. Discussion

### A. Evidentiary Hearing

An evidentiary hearing is not needed to address Big Eagle's contentions. "A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless 'the motion and the files and the records of the case conclusively show that [he] is entitled to no relief.'" Holder v. United States, 721 F.3d 979, 993 (8th Cir. 2013) (quoting Anjulo–Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008)). Further, "[n]o hearing is required where the claim 'is inadequate on its face

or if the record affirmatively refutes the factual assertions upon which it is based.'" Watson v. United States, 493 F.3d 960, 963 (8th Cir. 2007) (quoting Shaw v. United States, 24 F.3d 1040, 1043 (8th Cir. 1994)). Because the record convincingly refutes Big Eagle's assertions and show conclusively that he is not entitled to relief, an evidentiary hearing is not necessary.

### B. Big Eagle's Claims

Under Strickland v. Washington, 466 U.S. 668 (1984), Big Eagle must meet a two-prong test in order to prevail on a claim of ineffective assistance of counsel. Under the first prong, Big Eagle must demonstrate "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. To make such a showing, Big Eagle must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotation marks omitted). "Judicial scrutiny of counsel's performance must be highly deferential." Id. "When reviewing counsel's performance, a court must avoid using the 'distorting effects of hindsight' and must evaluate the reasonableness of counsel's conduct 'from counsel's perspective at the time.'" United States v. Carter, 629 F. Supp. 2d 934, 940 (D.S.D. 2009) (quoting Strickland, 466 U.S. at 689).

Under the second prong of Strickland, Big Eagle must demonstrate prejudice, by showing a reasonable probability that counsel's error altered the result of the proceeding. Strickland, 466 U.S. at 691. "To establish prejudice, [Big Eagle] must show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Wong v. Belmontes, 558 U.S. 15, 19-20 (2009) (quoting Strickland, 466 U.S. at 694). Where, as here, a defendant makes multiple claims of ineffective assistance of counsel, each claim must be independently examined to determine if there is prejudice, rather than taking the matters

collectively. See Hall v. Luebbers, 296 F.3d 685, 692-93 (8th Cir. 2002). That is, the Eighth Circuit has "repeatedly rejected the cumulative error theory of post-conviction relief." United States v. Brown, 528 F.3d 1030, 1034 (8th Cir. 2008). Thus, Big Eagle faces what the Supreme Court has characterized a "highly demanding" standard under Strickland. Kimmelman v. Morrison, 477 U.S. 365, 382 (1986). Big Eagle has not met that standard.

Grounds One and Three of the § 2255 motion relate to Big Eagle not testifying. As to Ground One, Hanna's affidavit makes clear that Big Eagle was properly advised about his right to testify and chose not to do so. CIV Doc. 17-2. Big Eagle may regret at this point not having testified at his jury trial, but his regret is not grounds for habeas corpus relief. Moreover, Big Eagle has failed to provide evidence that his testimony would have resulted in a different verdict. Indeed, as to the conviction on Counts III and IV, the conduct of Big Eagle in asking for, receiving, cashing, and distributing proceeds from Archie Baumann's check to tribal council members was established by Big Eagle's own statements in the meeting surreptitiously recorded by the Government's informant. Big Eagle could do little other than confirm what occurred or, if he were to deny it, expose himself to potential additional charges for perjury or at a minimum undermine his credibility. Big Eagle could have explained his financial predicament caused by caring for children, but Hanna already had introduced that situation to the jury.

As to Counts I and II relating to the bribery scheme involving contractors and the architect in the aftermath of the dormitory fire at the Tribe's school, Big Eagle could have denied involvement in any such bribery, although his plea of not guilty effectively did that. Hanna had assailed the credibility of Norman Thompson, Sr. and Raue and suggested that McClatchey had remembered the wrong person or not correctly remembered the one lunch meeting with Big Eagle about which he testified. Hanna also had established that Kutz and McClatchey paid Raue bribes and kickbacks rather than directly dealing with Big Eagle. Moreover, the Government

15

was armed with another witness who, if Big Eagle had testified and refused to admit ever shaking people down for money, was available on rebuttal to testify about another instance where Big Eagle as tribal chairman solicited a bribe.

As to the contention in Ground Three that Hanna failed to secure the proper instruction about Big Eagle not testifying, Big Eagle is simply mistaken. This Court gave a standard instruction that the fact of Big Eagle not testifying "must not be considered by you in any way, or even discussed, in arriving at your verdict." CR Doc. 87 at 9.

Grounds Two and Five of the § 2255 motion assert ineffective assistance of counsel in handling of McClatchey's testimony. However, Hanna secured a preliminary ruling from this Court preventing McClatchey from testifying that McClatchey perceived Big Eagle's remark to be a threat to his daughter. Nor did McClatchey ever testify to that. Rather, McClatchey upon being pressed by Hanna with the suggestion that he could not possibly remember a lunch and statement some five or six years previously, testified about how and why he remembered it and what Big Eagle was doing when he spoke—standing behind McClatchey's daughter with his hands on her chair. Big Eagle's challenges in Grounds Two and Five seek to have things both ways. Big Eagle asserts that Hanna did not sufficiently question whether the meeting even took place, although it was Hanna's casting doubt on the existence of the meeting that opened it up for McClatchey to testify about why McClatchey remembered it due to Big Eagle's position with reference to McClatchey's daughter when making the statement. Big Eagle then asserts that Hanna was ineffective in allowing that testimony in and not sufficiently preserving the issue on appeal. It was by carrying through with what Big Eagle wanted Hanna to do—cast doubt on McClatchey's recollection—that McClatchey's testimony about how Big Eagle made the statement came in.

Big Eagle relies on excerpts of the audiotape of the argument to the United States Court of Appeals for the Eighth Circuit to suggest that the judges on the Eighth Circuit panel perceived allowance of McClatchey's statement as being inappropriate or that Hanna did not properly preserve the issue. While the judges' statements and questions at oral argument are interesting, what this Court must follow is the opinion of the United States Court of Appeals for the Eighth Circuit. In that opinion, the Eighth Circuit concluded that there was not error in admission of the McClatchey testimony or how the McClatchey testimony was handled. Big Eagle, 702 F.3d at 1132.

Big Eagle has not shown ineffective assistance with regard to Grounds Two and Five. Hanna's handling of witness McClatchey was "within the wide range of reasonable professional assistance[.]" Strickland, 466 U.S. at 689. Big Eagle also cannot show a reasonable probability that the result of the preceding would have been different. Id. at 694. Of course, McClatchey's testimony had nothing to do with the facts underlying Big Eagle's conviction on Counts III and IV concerning the October 21, 2008 meeting and bribery and conspiracy therefrom. Moreover, it was Raue and Norman Thompson, Sr.—and not McClatchey—who testified that Big Eagle was receiving bribes while tribal chairman from money collected by Raue from those involved in rebuilding the school dormitory. McClatchey's testimony about Big Eagle's arguably ambiguous statement about "playing ball" was not such that the result of the proceeding would have been different but for McClatchey's testimony about the lunch during which he met Big Eagle.

Finally, Ground Four of the § 2255 motion alleges ineffective assistance for failing to adequately investigate and then drifts into suggesting that Hanna lacked experience and sought to withdraw. Those assertions are thoroughly refuted in Hanna's affidavit and did not reflect in Hanna's performance at trial. CIV Doc. 17-2. Hanna hired two separate private investigators and

17

himself interviewed many of the material witnesses. Hanna was prepared to cross-examine witnesses at trial and did an excellent job, at one point getting one Government witness to invoke his Fifth Amendment right not to answer a question to avoid self-incrimination. For the reasons detailed in the fact section, Big Eagle's contention about Hanna seeking to withdraw and saying he had only one prior federal court criminal jury trial is contrary to the facts. Hanna's representation of Big Eagle at trial was well within the purview of effective assistance.

The fact that Big Eagle did not get acquitted, except on one of the four counts, of course is not evidence of ineffective assistance. Rather, under the circumstances of this case, Big Eagle's convictions stemmed from the evidence of Big Eagle's complicity in bribery and conspiracy to commit bribery with respect to the Crow Creek tribal school's project and his obvious involvement and statements made and recorded during the October 21, 2008 meeting with Baumann where Big Eagle solicited and received a $5,000 check, which he in turn cashed and distributed to three tribal council members, a former tribal council member, and himself.

### III. Conclusion

For the reasons contained herein, it is hereby

ORDERED that Big Eagle's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Doc. 1, is denied. It is further

ORDERED, ADJUDGED AND DECREED that judgment of dismissal in favor of the Government and against Big Eagle under Rules 54 and 58 of the Federal Rules of Civil Procedure hereby enters.

Dated January 22, 2014.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE